Oak Leaf Mill Company *v.* Littleton.

Opinion delivered October 21, 1912.

1.  Master and servant—duty as to appliances and place to work.—The test of a master's duty in furnishing appliances and a place to work is what a reasonably prudent person would have ordinarily done in such a situation; and proof of what was the custom of others under like conditions and circumstances is evidence, but not conclusive, of what a reasonably prudent person would ordinarily do. (Page 399.)

2.  Same—negligence question for jury when.—Where a master furnishes, or causes to be built under his direction and control, a platform, scaffold, staging or like structure for the use of his servant in the prosecution of the work, it is his duty to exercise ordinary care to see that it is reasonably safe for the purpose contemplated; and

where the facts are such with reference to the negligence of the parties that reasonable minds might differ with respect thereof, the case should go to the jury. (Page 401.)

3. SAME—INJURY TO SERVANT—PROXIMATE CAUSE.—Leaving two planks unfastened in the floor of a log deck in a saw mill was the proximate cause of an injury to a log scaler where, when he was on the deck in the course of his duties, a log rolled down, struck the lower end of one of the planks and caused the other end to fly up and dislodge other logs which rolled down on him. (Page 403.)

4. SAME—ASSUMED RISKS.—A servant is bound only to see patent risks and does not assmue risks arising from latent defects or dangers in the machinery, appliances or place furnished for his use by the master. (Page 404.)

5. INSTRUCTIONS—IGNORING EVIDENCE.—An instruction to the effect that if defendant was guilty of negligence which caused plaintiff's injuries, and plaintiff was not himself guilty of contributory negligence, he was entitled to recover, was not objectionable as leaving the jury to find the defendant negligent, regardless of the evidence, where other instructions told the jury that a finding of negligence must be based on evidence. (Page 404.)

6. DAMAGES—PERSONAL INJURIES—EXCESSIVE VERDICT.—A verdict of $1,500 for injury to plaintiff's ankle was not excessive where he was confined to his room for a month, where his ankle was stiff and painful at the trial four months after the injury, and there was evidence that the injury was permanent. (Page 405.)

Appeal from Hot Spring Circuit Court; *W. H. Evans,* Judge; affirmed.

STATEMENT BY THE COURT.

This is an action by a laborer against his employer to recover damages for injuries received in the course of his employment. The facts in the case are substantially as follows:

The Oak Leaf Mill Company is a corporation engaged in the operation of a saw mill, and is the defendant in this action. The plaintiff, William Littleton, was a log scaler for the company, and his duties required him to pull the logs up into the mill from the mill pond, scale them, kick them out on the log deck and keep them down against the saw-carriage, where the sawyer could throw them on his carriage by a mechanical appliance called a "trip." Littleton's duties made it necessary for him to go at times to all parts of the log deck to keep the logs down where the sawyer could reach them. He was injured on the 20th day of September, 1911, and had been at work in the position of scaler for about one year before he was

injured. About one month before his injury the mill company constructed a new log deck. This log deck is situated in the east end of the saw mill. The log deck is an inclined platform sloping from north to south, with a gradual fall of three feet from the highest to the lowest point. It is eighteen feet long from north to south and between twenty-four and twenty-six feet wide from east to west. Attached to the log deck, and running north and south the length of the deck and parallel to one another, were skid rails along which the logs were rolled from the upper to the lower side of the deck. These skids were placed at a distance of about six feet apart, and were between six and eight inches higher than the deck floor. The deck was floored with planks two inches thick and twelve inches wide. The planks were nailed down upon heavy sills, which are eight inches thich and eight inches wide. All of the planks in the floor are nailed down except two at the lower side of the deck. The two unfastened planks are between five and six feet in length, and have the same width and thickness as the other planks in the deck floor. They are situated something like one half way between the east and west side of the deck, and are located on the lower side of the deck. An appliance called the "nigger bar" is situated directly beneath these two unfastened planks. The two unfastened planks rest upon the first and second sills, and their upper ends are supported by the second sill and fit up against the ends of the other planks of the floor which are nailed to the sill. Their lower ends are supported by the first sill and extend over the sill from five to six inches. The two unfastened boards are made to fit the other parts of the floor. To keep them in place and prevent their slipping, cleats of wood are nailed upon the under side of the two planks at both ends and fit up against the sides of the two sills which support the boards. In this way the two planks are fitted into the floor of the deck, so that they can be taken out and placed back without delay and inconvenience. The purpose of this is to enable the operatives to get to the bolts and other attachments of the nigger bar, which are located under the deck floor at this place, and by means of which the nigger bar is adjusted. Parallel with the south or lower side of the log deck and adjacent to it is the carriage track along which the saw carriage

runs. The logs were loaded from the deck on the saw carriage by means of a loading appliance which is situated at the lower end of the deck and operated by a lever in the sawyer's stand. This loading appliance consists of what is called a trip or "nigger bar" and the loader. The "nigger bar" is a perpendicular iron bar set back in the log deck some three feet from the edge of the deck which is next to the carriage track. It is about half way from the east and west side of the deck. The trip or nigger bar is secured by means of bolts and other attachments beneath the deck floor. South of the nigger bar, and between it and the edge of the log deck, is the "loader." This is a cylindrical shaft of iron some four inches in diameter, running east and west across the deck floor, and attached to the floor in such a manner as to enable the sawyer to operate a lever and make the loader seize the logs and throw them on the carriage. Attached to the loader, and extending at right angles with it, are iron arms or knives about two and one half feet long, which reach out and take hold of the logs on the deck which are to be loaded on the carriage.

William Littleton testified: "I had been working as log scaler for the defendant company about one year before I was injured. My duties made it necessary for me to go at times to all parts of the log deck to roll the logs down to where the sawyer could reach them. On the day I was injured I had pulled up from the pond and kicked out on the log deck enough logs to make the deck about half full. Some of the logs had knots on them and stopped on the inclined platform so there were no logs nearer the saw-carriage than about four feet. This made it necessary for me to move the logs down where the sawyer could get to them with his trip. The log nearest to the sawyer's carriage had a knot on it, and I took my cant hook and shoved the log down at its east end. I then went to the west end and pushed the other end of the log down. This left the other logs standing between four and five feet from the lower end of the log deck. They were stationary because of the small knots in the logs which kept them from rolling on down the log deck. After I had shoved the first log down I started to go back across the deck from the west to the east and walked between the log I had already shoved down and those which were stationary under the

deck above me.  While walking back across the deck, and just as I got about midway, and  stepped on one of the unfastened planks, the sawyer, being ready for the log which I had pushed down next to the carriage, worked his trip, and the log, being by the trip turned forcibly,. fell with a knot striking the projecting end of one of the unfastened planks with such force that it caused the upper unfastened end to fly up.  The upper unfastened end when it flew up struck one of the logs with such force that it jarred the logs loose and caused them to roll down towards me.  Because of the fact that I was on the unfastened plank that flew up, I became unbalanced, and in jumping towards the east to get clear of the logs I was caught by one of the logs rolling down on my foot before I could get in the clear, and my foot was badly crushed.  The old log deck had all of the planks on it nailed down.  The deck floor was habitually covered with bark and trash, and the fact that the two planks were not nailed to the floor was not noticeable, and I did not know that they were not nailed down like the rest of the floor."

Another witness for the plaintiff testified that he was a scaler for the mill company, and that a day or two before he had seen the loose planks kick up by having a log roll over and strike the lower end of them.  He said the upper end of the loose planks would jump up when the logs struck the lower end.

The sawyer for the mill company testified that just before Littleton was  hurt it was not necessary for him to operate the trip and throw a log on the carriage because he already had one on there.  He said that he did not operate the trip. He said that he never operated the trip until he was ready to place another log on the carriage, and that when he was ready to do this he made a fuss with the trip to give the scaler notice.

The dogger on the saw-carriage testified that he was looking at Mr. Littleton when the injury occurred.  He said it was his duty to watch him so he did not roll the logs so far that they would run on the carriage.  That when Mr. Littleton was hurt he was rolling down the logs himself.  That he had his shoulder against the handle of his cant hook trying to roll a log down.  That the log he was prying at broke loose from the other logs and the one just behind it rolled

down on Mr. Littleton before he could get out of the way.

W. N. Mosley testified: "I am the foreman of the defendant's mill, and have been engaged in the saw mill business about seventeen years. For the first ten years I was engaged in construction work, and during the last seven years in the operation of saw mills. During my employment in construction work I have built log decks for saw mills. I know what is considered a good log deck. I have examined log decks at other saw mills. The log deck at the mill of the defendant, where Mr. Littleton was hurt, is about the same as other log decks. I constructed it, and left the two planks unfastened in order that we might get down where the nigger bar was and adjust the bolts when it became necessary. It is necessary very frequently to adjust the bolts of the nigger bar. The logs do not, as a usual thing, roll down and cause the planks to kick up. They could not kick them up on account of the shaft on the other side of the mill. They go under the shaft, and I do not see how anything could go higher than that shaft. It could not go higher than four inches. It only extends about three inches over the shaft, and the logs rolling down there could not knock them and make them go higher than the shaft. It is the customary method of constructing log decks to have loose planks like the ones in question so as to take them out. I have not worked in any mill where they did not have the loose boards in the log deck. I never saw any mill that did not have the loose boards in the log deck, as we have them here. I do not see how the boards would kick up if a rolling log with a knot on it were to roll down and strike the end of the boards, because the shaft extends over the sill, as I have already indicated. The planks go under the skids and extend over the sill; if a log rolls down with a knot on it, the knot would not strike the two planks on account of the shaft. You would have to take the shaft out before it would.

William Littleton, recalled, testified:

"Q. Mr. Littleton, you heard what Mr. Mosley there testified with reference to that shaft preventing that plank from kicking up; under the circumstances I wish you would explain to the jury just how that is—I will ask you, first, is he or is he not mistaken about what he says?

"A. Well, I will make my statement, and they can say

for themselves. Now, this shaft runs across under there for these rollers to hang on; it is about five inches above the floor; and, when a log has a knot on it, it runs down and strikes under that shaft, and when it strikes down there, this plank flies up; the knot can go in between this shaft and the end of these boards, and that throws that up, like that (indicating).

"Q. There is nothing then to prevent a knot from striking that plank there and kicking that plank up, just like that, or just like it did do?

"A. No, there is nothing to prevent it from doing that; and he can describe it just like I can, and he knows it done it."

Other facts will be stated or referred to in the opinion.

The jury returned a verdict for the plaintiff, and from the judgment rendered the defendant has appealed.

*T. D. Wynne*, for appellant.

1. An employer is not an insurer of his employee's safety. He is not bound to furnish hisser vant with absolutely safe appliances, nor an absolutely safe place in which to work, but in the discharge of his duty in this respect he is held to the exercise of ordinary care only. 79 Ark. 437; 80 Ark. 263; 92 Ark. 138, 143; 97 Ark. 180. In determining whether the master has performed his duty of ordinary care with reference to providing reasonably safe instrumentalities and places for the employee to do his work, the legal standard is the custom and usages of employers engaged in like business, and with establishments similar to his own. 1 Labatt, Master & Servant, p. 110, § 44; 60 Ark. 582, 586; 159 Fed. 680, 86 C. C. A. 548; 17 S. W. 580; 136 S. W. 720; 67 S. E. 357; 125 S. W. 739. The presumption will prevail that the appellant was without negligence in the construction of its log deck until overcome by a preponderance of the evidence. 46 Ark. 567; 79 Ark. 437.

2. The evidence does not show that the two loose boards in the log deck were the proximate cause of the accident. Negligence, to be actionable, must be the proximate cause of the injury complained of. 76 Ark. 436; 77 Ark. 367; 86 Ark. 289.

3. The injury complained of was the result of a risk which appellee assumed. A servant assumes all the risks of his employment ordinarily incident to the service, and the

extraordinary risks when it is shown that he knew and appreciated the danger, and, in the absence of physical compulsion, elected to bear them. 68 Ark. 316; 77 Ark. 367; 82 Ark. 11; 97 Ark. 486.

4. Instruction No. 1 ignores the evidence in the case and practically charges the jury to find for the plaintiff regardless of the evidence if it believed that defendant was negligent in the construction of its log deck. 70 N. W. 671. An instruction not based on the evidence is erroneous. 35 U. S. 657; 183 U. S. 42; 63 Ark. 563; 76 Ark. 333; 77 Ark. 201.

*J. C. Ross,* for appellee.

1. There was evidence to sustain the verdict. The question whether appellant was negligent in the construction of the log deck was one for the jury. 97 Ark. 558, 559. It was the duty of appellant to exercise such degree of care as the particular circumstances demanded. 1 Thompson on Neg., § 25; *Id.* § 30; *Id.* § 32; 38 Ark. 266; 68 Ark. 259; 61 Tex. 3; 7 Mo. App. 359; 55 Me. 444; 31 Ala. 508; 50 Ill. 65; 109 Mass. 127; 1 Wash. 446; 43 Minn. 289.

2. Whether appellant was negligent, and whether that negligence caused appellee's injuries, were questions for the jury to decide under the disputed facts, and were properly submitted to them. 77 Ark. 458; 87 Ark. 217; 92 Ark. 102; 97 Ark. 358.

3. A servant does not assume the risks growing out of the negligence of the master.

4. No prejudice resulted to appellant by the giving of instruction No. 1. The jury was fully informed by other instructions given that the burden was on appellee to establish his claim to damages by a preponderance of the evidence.

HART, J., (after stating the facts). The defendant adduced evidence tending to show that the log deck in question was built like those in common use by other saw mills. Counsel for the defendant insist that, inasmuch as the master is not bound to use the newest and best appliances, he performs his duty when he furnishes those which are in common use and are reasonably safe, and that the former is the test of the latter. There is an irreconcilable conflict of opinion upon the question whether or not the master, in furnishing appliances

for the servant, has fulfilled his duty in this regard by furnishing those which are ordinarily used in the business. An extended discussion and citation of authority on both sides of the question will be found in the case note to *Niko Wiita* v. *Interstate Iron Company,* 103 Minn. 303, 16 L. R. A. (N. S.) 128.

A careful consideration of the question leads us to the conclusion that the contention of the defendant is not sound. It is true that a master is only bound to exercise ordinary care to furnish his servant a safe place in which to work. *Holmes* v. *Bluff City Lumber Co.,* 97 Ark. 180; *Ozan Lumber Co.* v. *Bryan,* 90 Ark. 223.

In the case of *Wilcox* v. *Hebert,* 90 Ark. 145, we held: "A master is only held to the exercise of ordinary care, proportionate to the danger to be incurred, in the selection of reasonably safe machinery and appliances, and in keeping them in proper condition, and it is not an insurer of the safety of the appliances furnished, nor bound to supply any particular kind of machinery, nor to use any particular character of safeguard against danger." But the controlling test of the exercise of reasonable care is not what has been practiced by others in like situation, but what a reasonably prudent person would have ordinarily done in such a situation. A bad custom may have grown up through ignorance or selfishness.

The jury were required to test the character of the defendant's conduct by what a reasonably prudent person would ordinarily have done in the like circumstances, as disclosed by all of the evidence, including that relating to the conduct and practice of others. What was the custom of others under like conditions and circumstances is evidence of what a reasonably prudent man would ordinarily do, but it is not conclusive evidence of that fact. Professor Wigmore, in discussing this phase of the question, says:

"The distinction is in itself a simple one: (1) The conduct of others evidences the tendency of the thing in question; and such conduct—*e. g.,* in using brakes on a hill, felt shoes in a powder factory, railings around a machine, or in not using them—is receivable with other evidence showing the tendency of the thing as dangerous, defective, or the reverse. But this is only evidence. The jury may find from other evidence

that the thing was in fact dangerous, defective, or the reverse, and that its maintenance was or was not negligence in spite of the above evidence. (2) Meanwhile, the substantive laws tell them what the standard of conduct for negligence is; and this standard is a fixed one, independent of the actual conduct of others. To take that conduct as furnishing a sufficient legal standard of negligence would be to abandon the standard set by the substantive law, and would be improper. This conduct of others, then, (1) is receivable as some evidence of the nature of the thing in question, because it indicates what is the influence of the thing on the ordinary person in that situation; but (2) it is not to be taken as fixing a legal standard for the conduct required by law. This distinction is patent enough, but it is sometimes judicially ignored. Such evidence is sometimes improperly excluded on the erroneous supposition that the mere reception of it implies that it is to serve as a legal standard of conduct. The proper method is to receive it, with an express caution that it is merely evidential, and is not to serve as a legal standard." Wigmore on Evidence, § 461. See also 1 Labatt on Master & Servant, § 50; *Chicago Great Western Ry. Co.* v. *McDonough*, 161 Fed. 657, 88 C. C. A. 517; *Chicago, M. & St. P. R. Co.* v. *Moore*, 166 Fed. 663, 92 C. C. A. 357, 23 L. R. A. (N. S.) 963.

It is next insisted by counsel for defendant that there was no negligence on its part, and that the court erred in refusing to take the case away from the jury. As we have already seen, it is the duty of the master to exercise ordinary care in seeing that the servant is provided with a reasonably safe place in which to work, and in default thereof he is guilty of negligence. Where a master furnishes, or causes to be built under his direction and control, a platform, scaffold, staging or like structure for the use of his servant in the prosecution of his work, it is his duty to exercise ordinary care to see that it is reasonably safe for the purpose contemplated. 26 Cyc. 1115. The general rule is that, where the facts are such with respect to the negligence of the parties that reasonable minds might differ with respect thereof, the case should go to the jury.

The alleged defect in the log deck was a structural one. The evidence on the part of the plaintiff shows that in the

discharge of his duties he was required at times to go on all parts of the deck, that frequently when the logs were started by him down the deck they would stop rolling on account of the knots in them, pinning them to the floor; that in such cases he was required to go down and take a cant hook and roll them down to the foot of the deck near the saw carriage; that the deck in question had two loose boards, which had cleats on the under side to keep them in place, but which were not nailed down to the sills like the other planks in the floor; that these unfastened planks fitted closely in to the other parts of the flooring; and that on this account, and because of the accumulation of shavings on the deck floor, he was not aware that the planks were not nailed down. On the day he was injured, a lot of logs had accumulated on the upper part of the deck, and failed to roll down to the lower end of it because of some knots in the logs. The plaintiff took his cant hook and rolled one of these logs down the deck next to the saw carriage. He says that on his way back from the west to the east end of the deck he had occasion to walk across these unfastened planks, and that just as he stepped on one of them the sawyer worked the trip, and this caused the log at the lower end of the deck to strike the unfastened plank and make it fly upwards. The plank as it flew upwards struck the mass of logs piled up above them on the floor of the deck with such violence as to dislodge them, and they rolled down and crushed his foot. The evidence on the part of the defendant shows that it was necessary to construct the log deck with these unfastened planks in order to go down under the deck to adjust the nigger bar, when it became necessary. Evidence was also adduced by it tending to show that this was the usual and customary way to construct log decks. It will be observed that the two planks had cleats nailed on their under side to keep them in place, so that the planks were constructed in the nature of a trap door. At but little cost, hinges or other fastenings could have been put on them so that when a log with a knot on it struck the lower part of the planks they would not fly up. The evidence for the defendant also tends to show that the injury did not happen as testified to by the plaintiff himself, but that the plaintiff himself started the logs to rolling by pulling on them with his cant hook.

It is also insisted by counsel for defendant that the case should have been taken from the jury because the physical facts are opposed to the testimony given on the part of the plaintiff. We can not agree with him in this contention. The plaintiff himself testified that the injury occurred as detailed above. Another witness for the plaintiff testified that he was a log scaler at the defendant's mill and had seen the unfastened planks fly up by reason of a log with a knot on it striking the lower end thereof. He said this had occurred only a day or two before the day he testified. The undisputed testimony shows that the unfastened planks extended about five inches over the sill next to the saw carriage, and, according to the testimony of the plaintiff, there was sufficient room for a log with a knot on it to strike the lower end of these unfastened planks and cause them to fly up. The shaft extended in a parallel direction to the lower end of the deck floor. The plaintiff said that a knot could go between this shaft and the end of the unfastened plank; that there was nothing to prevent the knot from striking the plank and kicking the plank up.

Under all the facts and circumstances adduced in evidence, we think both the question of the defendant's negligence and the plaintiff's contributory negligence were properly submitted to the jury. As bearing on the question and as illustrative cases, we cite the following: *Oak Leaf Mill Co.* v. *Smith,* 98 Ark. 34; *Doyle* v. *Missouri, K. & T. Trust Co.,* 41 S. W. (Mo. Sup. Ct.) 255; *Rice & Bullen Malting Co.* v. *Paulsen,* 51 Ill. App. 123; *Burnside* v. *Peterson,* (Col.) 17 L. R. A. (N. S.) 76.

It was contended by counsel for defendant that the leaving of the two loose boards in the log deck floor was not the proximate cause of the accident, but we can not agree with his contention, It is a fundamental rule of law that, to recover damages on account of unintentional negligence of another, it must appear that the injury was the natural and probable consequence thereof, and that it ought to have been foreseen in the light of the attending circumstances. *St. Louis, I. M. & S. Ry. Co.* v. *Bragg,* 69 Ark. 402; *St. Louis, I. M.. & S. Ry. Co.* v. *Buckner,* 89 Ark. 58; *Pulaski Gas Light Co.* v. *McClintock,* 97 Ark. 576.

From the evidence it appears that it was the duty of the plaintiff to go at times on all parts of the deck floor. The logs, by reason of having knots on them, frequently lodged on the deck floor, and the plaintiff was required to pry them apart and roll them down next to the saw carriage. According to the testimony of the plaintiff, it would sometimes happen that when the sawyer worked the trip on a log with a knot on it the knot would strike one of these loose boards and cause the upper end to fly up. That the end which flew up might strike logs which had lodged just above it and cause them to roll down was an occurrence which might reasonably have been anticipated and regarded as likely to happen.

Inasmuch as the plaintiff's duty required him to be on all parts of the log deck, and as, according to his testimony, he had no notice and could not be charged with notice that the planks were not nailed down to the floor, the injurious consequences of such an accident as did happen might have been avoided if the defendant had nailed the unfastened planks to the floor or had warned the plaintiff that they were not nailed down. When the situation of the plaintiff with reference to his work is considered, we are of the opinion that a man of ordinary experience and sagacity could foresee that the result which did happen might ensue.

Little need be said on the question of the assumption of risk. The alleged defect was a structural one, necessarily known to the master. A servant is bound only to see patent defects, and he does not assume the risks arising from latent defects or dangers in the machinery, appliances or place furnished for his use by the master. *Archer-Foster Construction Co.* v. *Vaughan*, 79 Ark. 20. As we have already seen, the deck floor was nailed down, except the two short planks, and, according to the testimony of the plaintiffs, these planks fitted up closely to the other part of the deck floor, and the whole floor was habitually covered with bark and trash, so that the fact of the two planks not being nailed down was not apparent. Therefore, the risk was not an obvious one, and for that reason was not one assumed by the plaintiff as an incident to his employment, and the question of assumed risk was properly submitted to the jury.

It is next insisted by counsel for defendant that the court erred in giving the following instruction to the jury:

"The court instructs the jury that it was the duty of the plaintiff, in the performance of his duties of employment, to exercise ordinary care for his own safety, and it was also the duty of defendant company to exercise ordinary care in furnishing plaintiff a reasonably safe deck floor on which to perform his duties and work. If, in the construction of said deck floor, defendant left unfastened planks so fitted up against the ends of other planks as not to be noticeable; and if you believe this was negligence, and further believe such negligence caused plaintiff's injuries to his foot and ankle, as charged in the complaint, then, unless the plaintiff was guilty of negligence, causing or contributing to his own injury, or assumed the risk of injury, he is entitled to recover in this case."

Counsel for the defendant insists that the instruction leaves out of consideration entirely the evidence in the case, and in fact tells the jury to find for the plaintiff if they believe that defendant was negligent in the construction of its log deck, regardless of the testimony in the case. We do not think the instruction is susceptible of that construction. The court in another instruction had told the jury what the relative duty of the plaintiff and defendant to each other was, and had expressly told them that their finding of negligence or not must be based upon the evidence. The court explained to the jury what constituted negligence on the part of the defendant, and manifestly by the language used in this instruction did not intend to tell the jury it might set up an arbitrary standard of negligence of its own, but, on the contrary, meant to tell the jury that negligence on the part of the defendant must be found by them from the evidence introduced in the case, under the law as given them by the court.

Finally, it is contended by counsel for defendant that the verdict is excessive. The jury returned a verdict for the plaintiff in the sum of fifteen hundred dollars. The plaintiff was confined to his room for one month. He testified that his ankle was still stiff, and that he could only walk with difficulty. Other evidence was introduced by him tending to show that his injury was permanent. The plaintiff testified that he suffered great pain from the injuries, and that his foot pained him

at the time of the trial, which was nearly four months after the injuries were received by him. Therefore we do not think the verdict is excessive. The judgment will be affirmed.

KIRBY, J., dissents.