ARKANSAS-LOUISIANA GAS COMPANY *v.* TILLMAN.

4-6098 144 S. W. 2d 1077

Opinion delivered November 25, 1940.

*Buzbee, Harrison, Buzbee & Wright,* for appellant.

*J. H. Lookadoo* and *Wm. J. Kirby,* for appellee.

HUMPHREYS, J. This suit was brought by appellee against appellants in the circuit court of Clark county for an injury to his lungs occasioned by strangling on coal oil taken into his mouth in siphoning coal oil from a 55-gallon barrel into a 5-gallon can by means of a small copper tube about four feet in length and ⅜-inch in diameter alleged to have been negligently furnished him by appellant with which to transfer coal oil from the larger receptacle to the smaller one without first warning him of the danger incident to making the transfer.

The specific allegation of negligence contained in the amended complaint, is, in substance, that Stanley Grice, acting for himself and appellant company, ordered appellee to go to McMillan for instructions, knowing at the time that McMillan was using a ⅜-inch copper tube as a siphon to get the coal oil out of the larger barrel by putting one end of the tube in the barrel and bending the other end over the top of the barrel and sucking the exposed end to start the oil flowing; that Grice knew this method was unsafe for appellee to use, or by the exercise of ordinary care should have known

it; that Grice, acting for himself and appellant company, failed to warn appellee of the dangers attendant on handling coal oil by this method when Grice knew, or, in the exercise of ordinary care, should have known this method was dangerous. Appellants filed answers denying each and every material allegation in the complaint, and pleaded assumed risk and contributory negligence on the part of appellee.

The cause was submitted to a jury on the pleadings, the testimony introduced by appellee and appellants and the instructions of the court, resulting in a judgment against appellant, from which is this appeal.

At the conclusion of the testimony peremptory instructions were requested by each of the appellants and by them jointly for an instructed verdict in their favor. The court refused to give each of the instructions over the objections and exceptions of the respective appellants.

Appellants contend that they were entitled to an instructed verdict in their favor under the facts viewed in the most favorable light to appellee because the facts so viewed do not tend to show any actionable negligence on the part of appellants.

The facts viewed in the most favorable light to appellee are, in substance, as follows: Appellant, Arkansas-Louisiana Gas Company, was engaged in laying pipe lines in the town of Gurdon in the spring of 1939. Stanley Grice, one of the appellants, was the local manager of the gas company and A. W. McMillan was night watchman on the job and had been performing all the duties required of the night watchman for a considerable length of time. The duties of the night watchman were to keep lanterns and flares lighted at night and placed at points to warn the public against dangerous conditions or situations arising in the course of the work. In part, the night watchman's duties were to fill the lanterns and flares with coal oil out of a 55-gallon barrel in the gas company's warehouse at Gurdon. The method by which McMillan did this was to draw by siphoning coal oil from the barrel into a 5-gallon can and then fill

the lanterns and flares out of the smaller can. In order to siphon the coal oil out of the barrel into the 5-gallon can he used a pliable copper tube, ⅜-inch in diameter and about four feet long which he found in the warehouse of the gas company. He bent the tube so as to insert it in the barrel and left the other end exposed on the outside of the barrel at a lower level than the end that was placed in the coal oil in the barrel. He then sucked the exposed end until the coal oil began flowing from the barrel through the tube and after the flow started he would insert the end of the tube into the 5-gallon can until the smaller can was filled by the siphoning process. The 55-gallon barrel had no faucet or pump by which to transfer the coal oil from it to the small can. He made no request of the gas company to furnish either, but continued to make the transfer through the small copper tube by the siphoning process. At one time Stanley Grice asked McMillan how he was getting the coal oil from the larger barrel, and he explained to him that he siphoned it out, and Stanley Grice said to him that he was going to put a faucet on it. Nothing further was said or done about it and the siphoning method of transferring the oil from the barrel to the can was continued. When the wage and hour law went into effect A. W. McMillan was only allowed to work as night watchman forty-eight hours a week and appellee was employed by Stanley Grice to work as night watchman during the time that McMillan could not work under the law. When Stanley Grice employed appellee he directed him to go to A. W. McMillan, the regular night watchman, who would show him where to get the lanterns and flares and how to fill them with coal oil. When appellee reported for work McMillan showed him the copper tube and showed him how he siphoned the coal oil through the tube from the barrel into the 5-gallon can. He siphoned some of the coal oil himself from the barrel into the can in appellee's presence. He adopted the method which McMillan had been using and continued to make the transfer of coal oil from the barrel to the can by the siphoning method for about three weeks with safety to himself. According to appellee's

testimony he made the transfer of coal oil from the barrel to the can about nine times and that on the evening of July 8, he found that the level of the coal oil in the barrel had been lowered by the removal of some of it in this way so that the end of the tube inserted in the barrel was not down in the coal oil a sufficient depth to keep same flowing through the tube and that after it would flow a while it would stop. In order to remedy this appellee tilted the barrel to one side and placed a block under it so as to keep it in place and in order to fill the 5-gallon can he had to suck the exposed end of the copper tube three or four times and in the fourth attempt he became strangled on fumes and coal oil which went down his windpipe into his lungs, rendering him unconscious for about a minute. When he came to himself, he went home, ate a few bites and returned to his duties as night watchman, and after placing some sixteen flares and lanterns on a wheelbarrow and taking and placing them in positions necessary to warn pedestrians and travelers against the dangers created in the course of the construction work the burning sensation in his chest became severe whereupon he returned to his home and sent his son to fill his position during the night. He sent for a physician the next morning who examined him and found that he had a temperature of 104 degrees and was breathing like a man with asthma. The following day appellee went to Arkadelphia and entered the hospital of Dr. H. A. Ross of that city. Dr. Ross's examination revealed that appellee had pneumonia for which he treated him for thirty-one days at which time he discharged him from the hospital. The medical testimony introduced was in accord to the effect that the coal oil being an irritant could have produced an irritation in the lung tissue of sufficient area so that pneumonia germs in the respiratory tract might set up activity. There is substantial evidence that appellee had pneumonia as a result of the irritation caused by sucking the coal oil or fumes down his windpipe which created an area where pneumonia germs might and did set up activity. The medical testimony is in dispute as to whether the consolidated area in his lungs had dissolved and as

to whether the injury to his lungs was permanent or temporary. The testimony reflects that taking coal oil into the mouth and swallowing it in reasonable quantities of perhaps a tablespoon full would not cause any ill effects or taken in small quantities would not produce pneumonia or any other disease, the reason being that it is not a toxic agency that possesses any inherent or latent properties.

The testimony also reflects that siphoning coal oil or gasoline from one receptacle into another is a common and ordinary method in making such transfers. There is nothing in the testimony showing that the tube was defective in any way that caused appellee to strangle or get the coal oil in his windpipe and lungs. The evidence does show that other methods are used such as a faucet or a pump for making the transfer of coal oil and gasoline from one tank to another and that in this particular case if a faucet or pump had been used it would not have been necessary for appellee to take the coal oil in his mouth. We do not find anything in the evidence tending to show that the siphoning method of making the transfer is obsolete or that employers are required to use the faucet or pumping method in the exercise of ordinary care to provide a safe place and safe instrumentalities for transferring coal oil from one receptacle into another.

The testimony also reflects that appellee was fifty-two years of age and for as much as a year had operated a service station at Gurdon and handled gasoline and coal oil. He was a man of intelligence and experience.

The general rule of law is that a duty rests upon a master or employer to exercise reasonable care to provide his servants or employees with safe and reasonable working places, appliances and machinery with which to do his work. In the case of *St. Louis, I. M. & So. Ry. Co.* v. *Copeland,* 113 Ark. 60, 167 S. W. 71, this court announced a test by which to determine whether a master has performed his duty to his servant in the following language: "The general rule is that a master must exercise ordinary care to provide his servants a reasonably safe place in which, and reasonably safe instruments with

which, to work. The test of a master's duty in furnishing appliances and a place to work is what a reasonable prudent person would have ordinarily done in such a situation. *Oak Leaf Mill Co.* v. *Littleton*, 105 Ark. 392, 151 S. W. 262. The duty of a master to exercise ordinary care to provide his servant a safe place to work requires that he shall anticipate all such dangers as will likely flow from the conditions of the place in which his servants work, and the appliances with which they are provided to work. But the master is not bound to foresee and provide against every possible accident. In other words, the duty imposed does not require the master to use every possible precaution to avoid injury to his servants, but he is only required to use such reasonable precautions to prevent accidents as would have been adopted by prudent persons prior to the accident. After an accident has occurred, it may be easy to see what would have prevented it, but that of itself does not prove, nor tend to prove, that reasonable or ordinary care would have anticipated and provided against it. Labatt's Master & Servant (2d Ed.), Vol. 3, §§ 1042 and 1045. See also 26 Cyc. 1092; *Ultima Thule, A. & M. Rd. Co.* v. *Benton*, 86 Ark. 289, 110 S. W. 1037; *St. Louis, K. & S. E. Rd. Co.* v. *Fultz*, 91 Ark. 260, 120 S. W. 984.''

In applying this rule and test to the facts in the instant case as detailed above we think appellants discharged their duty to appellee when they furnished him a pliable copper tube, having no defect in it, with which to siphon coal oil from the barrel into a 5-gallon can and by demonstrating the manner in which to use it.

The siphon process of transferring any nonpoisonous liquid from one receptacle to another is a method in common and general use, and the use of the siphon is so well understood that ordinarily a master would not be required to instruct an employee how to use a siphon. The way to use it is to insert one end in the liquid in one vessel and to create a vacuum in the tube by sucking out the air so the liquid will flow into the other vessel. In operating it, there is no necessity to take any great amount of the liquid into the mouth or to swallow it. There is no hidden hazard in the use thereof. As soon as

the liquid reaches the mouth, the end should be inserted in the other receptacle so that the flow will continue. If one should permit the liquid to flow into his mouth and attempt to swallow it or get it in his windpipe it would be his own fault or if one should suck the liquid down his throat into his windpipe so that it would reach his lungs it would be through his own carelessness.

Certainly an employee of ordinary intelligence and experience would not have to be told or warned not to swallow the liquid or suck it down his windpipe. That an employee would do such a thing in the use of a siphon could not be anticipated by a master. If there was any risk at all in the use of the siphon it was an ordinary risk incident to the employment and not a risk against which an intelligent and mature servant should be warned. The evidence shows that A. W. McMillan had used the siphon for some time without injury to himself, and it also shows that appellee himself had used the siphon eight or nine times covering a period of about three weeks without injury himself. There are no toxic properties in coal oil making it any more dangerous to remove from one vessel to another by the siphoning process than in removing any other nonpoisonous fluid. In fact the two fluids of coal oil and gasoline are among the most common fluids that are removed from one vessel to another by this process.

We are unwilling to lay down the rule that an employer employing one to siphon coal oil from one receptacle to another must warn a mature and intelligent employee not to swallow any of the coal oil or suck any of the coal oil or fumes therefrom down his windpipe into his lungs.

We, therefore, conclude no actionable negligence was attributable to appellants under the facts detailed above.

Ordinary care on the part of appellee in the use of the siphon system would have prevented the injury which he claims to have suffered, so the injury was occasioned by his own carelessness, and if there was any risk in the use of the siphoning system it was an ordinary risk incident to the business which appellee assumed.

■■■■■■■■■■■■■■■■■■

In view of this conclusion the judgment must be, and is reversed, and the cause is dismissed.