Yazoo & Mississippi Valley Railroad Company *v*. Hill.

Opinion delivered December 22, 1919.

1. Carriers—safe ingress and egress.—It is the duty of a railroad company to use ordinary care to provide passengers with a safe and convenient method of ingress and egress to and from its cars, and the company is liable for damages by reason of neglect of such duty.

2. Carriers—evidence of custom—negligence.—While evidence of the custom of other railroad companies under like conditions was evidence tending to show that defendant was not negligent in providing a place for the transfer of its passengers from its coaches to a transfer boat, it was not conclusive evidence of that fact.

3. Carriers—negligence and contributory negligence.—In an action by plaintiff to recover damages for the death of her husband sustained in attempting to jump from a stage plank furnished by defendant for the transfer of its passengers to a ferry boat, where there was evidence tending to prove that the entrance to the stage plank was in a slippery and unsafe condition,

and the evidence as to whether deceased was drunk was con-
flicting, *held* the questions of negligence and of contributory neg-
ligence were for the jury.

4. APPEAL AND ERROR—CREDIBILITY OF WITNESSES.—The jury, and
not the appellate court, were the judges of the credibility of the
witnesses.

5. CARRIERS—CONTRIBUTORY NEGLIGENCE—IMMINENCE OF DANGER.—
Where a passenger is suddenly confronted by imminent danger,
he can not be expected to calculate chances or to deliberate upon
the means of escape; and if he acts as a man of ordinary pru-
dence placed in similar circumstances, and in doing so makes an
effort to escape injury and is injured, the carrier is responsible
for damages.

6. TRIAL—REPETITION OF INSTRUCTIONS.—It was not error to refuse
an instruction fully covered by instructions given.

7. TRIAL—REFUSAL OF ARGUMENTATIVE INSTRUCTION.—Requested in-
struction "that the law does not impose on the railroad company
the duty of so providing for the safety of persons going from
the train to the boat in this case that they will encounter no pos-
sible danger and meet with no casualties in the use of the appli-
ances provided" *held* to be argumentative, and therefore properly
refused.

8. DEATH—DAMAGES.—In an action by a wife for death of her hus-
band, 61 years old, testimony tending to prove that he had been
furnishing her from $150 to $175 per month for the support of
the family *held* to warrant a verdict for $12,000.

Appeal from Phillips Circuit Court; *J. M. Jackson,*
Judge; affirmed.

### STATEMENT OF FACTS.

Mattie Lee Hill, administratrix of the estate of W.
L. Hill, deceased, brought this action against the Yazoo
& Mississippi Valley Railroad Company to recover dam-
ages for the death of her husband and intestate, W. L.
Hill, which was caused by his attempt to jump from the
stage plank of the transfer boat of the defendant at Trot-
ter's Point, Mississippi, his body striking the guard of
the boat whereby he received injuries from which he died.

The defendant was a common carrier operating a
railroad from Memphis, Tennessee, to Helena, Arkansas.
The coaches of the train were usually carried down an
incline at Trotter's Point, Mississippi, and run on a track

which was laid on the transfer boat and was thus carried across the Mississippi River to Helena where the coaches were pulled by an engine from the boat up the incline on that side of the river.

W. L. Hill was a resident of Memphis, Tennessee, and on the 24th day of May, 1917, bought a ticket from Memphis to Helena, Arkansas. He took passage on one of the defendant's trains, and when the train arrived at Trotter's Point, Mississippi, it was ascertained that the incline was out of repair and that the passengers would have to leave the coaches and walk down the river bank to the transfer boat, and thus be carried across the river. For this purpose the railroad company had prepared a passageway to the boat by making an excavation in the sand at the top of the bank of the river about eight feet in length and six feet deep. This incline was gradual and was followed by ten steps which had been cut in the sand. Each step was about twelve inches wide and was variously estimated to be from six inches high up to the height of a regular house step. From the bottom of the steps cut in the sand, a gang or stage plank about 24 feet in length and 3½ feet wide, extended to the boat. The gang plank was without guard rails.

One of the witnesses for the plaintiff said that the end of the gang plank resting on the bank of the river was much higher than the end which rested on the boat.

The witnesses for the defendant said that the gang plank was about five feet higher on the bank than it was at the boat. Some of the passengers had gone on down the bank ahead of W. L. Hill after they had left the train. A woman with her little child and its nurse were walking along the stage plank next to the boat. Another woman and her companion were on the stage plank next to the bank. Hill started down the bank and while going down the steps his foot slipped, and in attempting to recover his balance he first walked fast and then began to run as he approached the stage plank and hallooed to the passengers next to him to look out, and brushed by the woman and her companion. Before he reached the boat he

leaped from the stage plank towards the boat and struck the edge of the boat with great violence, falling on the pit of his stomach. He was rendered unconscious, and was given first aid by a physician present who was, also, a passenger. The physician gave him an injection of morphine to ease his pain and said that as soon as he examined Hill he knew that his injuries were fatal. When the transfer boat had crossed the river to Helena, Hill was placed in charge of the conductor of the train. In a short time a surgeon of the railroad company came down to the station and ordered Hill removed to the hospital of the railroad company. After remaining at the station for awhile he was carried to the hospital and died four or five days later. In the meantime, he suffered great agony.

The physician who rendered first aid to him testified that when he first examined Hill he did not appear to have been drinking. He also said that Hill talked in a rational manner after he became conscious. He admitted, however, that he had given a statement to the claim agent of the railroad company in which he stated that he had smelt whiskey on Hill's breath. He asserted, however, that he was testifying as to the truth of the matter as he recollected it and did not know how this came to be in the statement he made to the claim agent. When Hill was received at the hospital he had two one-half pint bottles of whiskey in his pockets and about one-half of one of them had been drunk. His wife was summoned to his bedside and remained there until he died. She testified that he left home with two one-half pint bottles of whiskey and that neither of them had been opened when he left home. She said that he drank whiskey, but was not addicted to getting drunk and that he was perfectly sober on the day he left home on the journey which proved fatal to him.

Other witnesses for the plaintiff also testified that he appeared to be sober on the occasion in question. They were passengers on the train and witnesses to the accident, and stated that Hill's foot slipped, and that he be-

gan to walk fast and then run in an effort to regain his balance. It was also shown that the sand of the river bank was soft and yielding and wet and slippery. One of the witnesses for the defendant, who was a much younger man than Hill, testified that his foot slipped in going down the steps, and that he nearly fell. He characterized the condition of the steps as dangerous. Hill was sixty-one years old at the time of his death. He was accustomed to traveling and was a stout, active man for his age.

On the part of the defendant, it was shown that a sudden rise in the Mississippi River had caused some of the pilings of the incline to become loose, and that for this reason it was necessary for the passengers to leave the coach on top of the river bank and walk down the bank to the transfer boat for a few days until the incline could be repaired. Passengers were transported several times a day in this manner. The section crew of the railroad made the pathway as has been described above, and it was shown by the railway company that there was no obstruction in the way which could have caused Hill to stumble. The section crew were witnesses for the defendant and testified that the sand was soft and yielding, and that, when each train load went either down or up the incline, they smoothed off the steps which they had cut in the sand, and made them entirely safe for the next trip.

The transfer boat had a night and day captain, who were also the pilots of the boat. Each of them had had much experience in navigating the Mississippi River, and testified that the method adopted for transferring the passengers from the coaches to the transfer boat and from the transfer boat back to the coaches was the best method of doing so under the circumstances, and that it was the method usually adopted by boats plying the Mississippi River. They said that it was not customary and that it was impractical to have guard rails on the stage plank. It was also shown that between the boat and the river and under and on the sides of the gang plank, there was soft sand and no rocks, sticks, or other obstructions.

Several witnesses for the defendant testified that Hill was drunk on the train from Memphis to Trotter's Point, and that he was drunk as he walked down the river bank. Some of them said he gave a yell as he started to run and another one as he jumped from the stage plank towards the boat. The conductor of the train said that, after they arrived at Helena, Hill admitted to him that he was drunk. The driver of the ambulance also stated that Hill admitted to him on the way to the hospital that he was drunk. The head nurse at the hospital, also the one who attended him, both say that he was very drunk when he was received at the hospital. Other facts will be stated or referred to in the opinion under appropriate headings.

The jury returned a verdict for the plaintiff, and the defendant has appealed.

*F. A. Montgomery* and *Fink & Dinning,* for appellant. ·

1. The peremptory instruction asked should have been given, as there was no proof of negligence on the part of appellant. 40 A. & E. R. R. Cases (N. S.) 226; 51 S. E. 443 and note 240; 95 U. S. 439; 15 Fed. 880; 55 Cal. 593; 66 Barb. (N. Y.) 43; Wharton on Negl., § 1 and notes.

2. It was error to refuse the four instructions asked by defendant, as they are the law and are supported by the evidence. 10 C. J. 911 and notes; 126 La. 502; 52 So. Rep. 678; 139 Am. St. 542; 115 Ark. 262.

3. The verdict is contrary to the overwhelming preponderance of the evidence, as no negligence was shown on the part of the appellant or its employees.

4. The verdict is excessive. 99 Miss 697; 103 *Id.* 830; 106 *Id.* 615; 108 *Id.* 421; 109 *Id.* 536; 74 So. 835. The verdict should be diminished in proportion to the negligence of the intestate.

*Pace, Seawel & Davis,* for appellee.

1. Appellant was a carrier for hire and had ample knowledge of its duty to provide a safe approach down

the embankment to the steamer operated by appellant. There was no error in refusing a directed verdict for defendant. The approach was dangerous, and appellant knew it or should have known it. The evidence does not show intoxication of deceased or other contributory negligence. The approach was unsafe and dangerous. The verdict settles the question of the negligence of defendant.

2. Deceased was not guilty of contributory negligence and the verdict of the jury settles the question as to the negligence of defendant, as does the testimony.

3. There was no error in refusing appellants requested instructions.

4. The verdict is not excessive. Deceased had an expectancy of life of thirteen years and at $1,800 he would have earned over $24,300 which, reduced to its present value, would amount to $15,091.20, a sum in excess of the verdict. The case was fairly tried by an impartial jury and is free from prejudicial error and should be affirmed.

Hart, J., (after stating the facts). The court submitted to the jury the question of the negligence of the defendant and the contributory negligence of W. L. Hill. The court instructed the jury that the burden of proof was upon the plaintiff to establish the negligence of the defendant, and upon the defendant to show contributory negligence on the part of W. L. Hill.

In the first place, it is strongly insisted by counsel for the defendant that the evidence fails to show any negligence on the part of the defendant and that for this reason the court erred in submitting the question to the jury. In determining this question it becomes necessary to consider the duty of the defendant toward W. L. Hill. The relation of the carrier and passenger still existed when Hill was injured. It is the duty of a railroad company to use ordinary care to provide passengers with a safe and convenient method of ingress and egress from its cars, and the company is liable for damages by reason

of the neglect of such duty to its passengers in descending from a car at a station or from the cars down the river bank to the transfer boat in the present case. *K. C. Sou. Ry. Co.* v. *Watson,* 102 Ark. 499; *St. L., I. M. & S. Ry. Co.* v. *Woods,* 96 Ark. 311; *St. L. & S. F. Rd. Co.* v. *Caldwell.* 93 Ark 286, and *Little Rock & Ft. Smith Ry. Co.* v. *Caveness,* 48 Ark. 106.

The defendant admits that it was bound to use ordinary care to provide safe and suitable accommodations to enable its passengers to leave its coaches on top of the river bank and to embark on the transfer boat, but they insist that the undisputed evidence shows that they did provide such accommodations, and that the happening of the accident in question was such an accident as could not reasonably have been anticipated by the defendant, and the omission to provide against it could not constitute actionable negligence. They point to the fact that they first made an incline at the top of the bank and followed this with steps down to the gang plank and that the gang plank itself was three and one-half feet wide with cleats on it for the purpose of preventing the passengers from slipping while walking on it. They kept a crew there for the purpose of smoothing out the steps after each train load of passengers passed down them. All the members of this section crew testified that they did smooth out the steps after each trip and that there were no obstructions there. It was also proved by the two captains that they were experienced river men, and that the method used there was the best method in use on the Mississippi River, and that it was the one usually adopted by all the boats on the river. This testimony was not sufficient to take the case from the jury upon the question of the negligence of the defendant. The river bank at the point in question was sand, and the witnesses for the plaintiff testified that the sand was soft and yielding and wet and slippery. One of the witnesses for the defendant testified that the steps were dangerous on this account. There were no posts driven up and down the bank and ropes or guard rails attached to them.

This might have been done in a very short time and at a very little expense.  Moreover, there were only ten steps and the carrier might have built wooden steps of rough lumber and temporarily anchored them in the sand.

The jury as men of experience in the ordinary affairs of life might have found that this could have been done at little cost and was necessary for the safety of the passengers in ascending and descending the river bank.  It is true the captains of the transfer boat testified that the method used was the best method, but the jury might not have believed their testimony in this regard.  Moreover, if the method adopted by the railroad company was wrong, the use of the same method by others could not right the wrong.  What was the custom of others under like conditions was evidence tending to show that the railroad company was not negligent in providing a safe and suitable place for the passage of its passengers from its coaches to the transfer boat, but it was not conclusive evidence of that fact.  The jury might find from other evidence that the way provided was dangerous and defective in spite of this evidence.  The conduct of others is received as evidence of the nature of the thing in question because it indicates what is the influence of the thing on the ordinary person, in that situation; but it is not to be taken as fixing a legal standard for the conduct required by law.  Wigmore on Evidence, § 461, and *Oak Leaf Mill Co.* v. *Littleton,* 105 Ark. 392, and cases cited. In the case last cited the court was dealing with the test of a master's duties in furnishing a safe place for his servant to work, but the principle is the same, and what was said in that case applies with equal force here.  The jury might have found that the method used by the railroad company was not a safe method for the discharge of its passengers, and it is not a sufficient answer to say that it was the same kind of way that is usually used by boats plying the Mississippi River.  The court submitted the question of the negligence of the defendant to the jury under the principles of law above announced, and we do not think it erred in doing so.

It is next earnestly insisted by counsel for the defendant that the court erred in not telling the jury, as a matter of law, that the defendant was guilty of contributory negligence. In the first place they contend that practically the undisputed evidence shows that W. L. Hill was drunk at the time the accident occurred, and that this caused him to stumble and that the consequences which followed were due to his being drunk.

We can not agree with counsel in this contention. Hill's wife testified that he left hóme sober and only had two one-half pint bottles of whiskey when he left home. She said that he placed them in his pocket because his grip was full of other things. The witnesses for the plaintiff, who were passengers on the train and saw the accident, said that Hill did not appear to be drunk, and that he walked down the river bank much in the same way the others did until he stumbled and endeavored to recover himself by walking faster. The physician who administered first aid to him and gave him an injection of morphine said that he did not appear to be drunk, and that after he regained consciousness Hill talked to him intelligently.

It is true the conductor testified that Hill was very drunk while they were waiting at the station for an ambulance to take him to the hospital, but the jury might have found that Hill drank some of the whiskey after he was injured to ease his pain and that the whiskey and morphine together made him very drunk. The ambulance driver says that he admitted to him that he was drunk and the head nurse at the hospital said that he was very drunk when he reached there, but as above stated, this might have been accounted for by the jury on the theory that he drank some whiskey after he was injured.

It will be remembered that his wife testified that there was no whiskey used out of the two one-half pint bottles at the time he left home. The jury were the judges of the credibility of the witnesses, and it can not be said that there is no evidence of a substantial char-

acter to support their finding that Hill was not guilty of contributory negligence in this respect.

Again, it is contended that the court should have told the jury as a matter of law that Hill was guilty of contributory negligence because he jumped from the stage plank towards the boat when all around the stage plank there was soft sand upon which he might have jumped, and thus prevented the injury  We can not agree with counsel in this contention.  This court has uniformly held that on occasions where a passenger is suddenly confronted by imminent danger, he can not reasonably be expected to calculate chances, or to deliberate upon the means of escape, but that he must of necessity judge of the danger by the circumstances as they at the instant appear to him and not by the result.  Immediate action and decision are required of him, and if he acts as a man of ordinary prudence placed in similar circumstances, and in doing so makes an effort to escape injury and is injured, the railroad company is responsible to him for his damages.  *Railway Co.* v. *Murray,* 55 Ark. 248; *Jacks* v. *Reeves,* 78 Ark. 426; *St. L., I. M. & S. R. Co.* v. *Stamps,* 55 Ark. 248; *K. C. Sou. Ry. Co.* v. *Watson,* 102 Ark. 499.

Under the evidence adduced by the plaintiff the jury might have found that Hill did not have time to look at the ground under the gang plank and see whether it was safe to jump there or not; but that, realizing that a woman and child and its nurse were in front of him on the stage plank, with whom he must come in contact unless he jumped, he leaped from the gang plank to avoid injuring them and himself, thinking that he could safely land on the boat.  Therefore, we do not think the court erred in submitting the contributory negligence of Hill in this regard to the jury.

It is next insisted that the court erred in refusing to give instruction No. 4, asked by the defendant.  The instruction reads as follows: "You are further instructed that the duty of the carrier as to its premises is not to furnish absolutely safe premises, or premises

as safe as possible; if it adopt a method of construction of a standard character such as is generally adopted by other well-regulated carriers, and exercises reasonable care to keep the premises in repair, its duty is sufficiently performed.''

If it be assumed that the instruction was correct, it is fully covered by instruction No. 3, which was given to the jury at the request of the defendant. This will be readily apparent from reading and considering the two instructions together. Instruction No. 3 is as follows: ''You are instructed that if you believe from the evidence that the incline of the defendant at Trotter's Point, Mississippi, connecting its railroad track with its transfer boat, was out of repair without the fault of the defendant but owing to the changes of the water of the river, and that the defendant was for that reason obliged to transfer its passengers from the train on the Mississippi side onto a train on the boat, and that the defendant provided such a reasonably safe way to approach the boat as was in general use and such as a reasonably prudent person would provide, then the jury will find for the defendant, even though they believe that he was sober and in the exercise of reasonable care for himself, and did slip on the sand steps that had been provided on account of the condition of the ground, and this was the cause of his injuries.''

It is next insisted that the court erred in refusing to give instruction No. 5, at the request of the defendant. The instruction is as follows: ''You are further instructed that the law does not impose on the railroad company the duty of so providing for the safety of persons going from the train to the boat in this case that they will encounter no possible danger, and meet with no casualties in the use of the appliances provided.'' This instruction was also covered by the matters embraced in instruction No. 3. Besides the instruction as asked is argumentative in form, and for that reason need not have been given by the court.

It is next insisted that the court erred in not giving instructions Nos. 6 and 8, asked by the defendant. These instructions will be considered together. They are as follows: No. 6. "You are further instructed that if you believe from the evidence that the death of the plaintiff's intestate was caused by his attempting to jump from off the gang plank of the defendant's landing from the river to its transfer boat, when there were other means by which he could have reached the boat in safety to himself and others, that the law is that the plaintiff's intestate assumed the risk of jumping into the boat, and the defendant is not liable, and the jury will so find." No. 8. "You are instructed that if you believe from the evidence that the cause of the death of the plaintiff's intestate was that he unnecessarily jumped or attempted to jump from the gang plank to the boat, then you are instructed that the casualty has no connection with the fact that he lost his balance in coming down the bank, if you believe he lost his balance in that way and the injury to him, but that his injuries were solely caused by the jump, and the jury will find for the defendant."

As we have already seen, the fact that the result showed that there was a way for Hill to have escaped mortal injury by jumping on the sand, and that in the emergency he chose the one which proved fatal to him, would not characterize his act as one of negligence as a matter of law. Therefore the court did not err in refusing to give either of these instructions.

Finally, it is insisted that the verdict is excessive. The complaint is in two counts. In the first count the plaintiff sued for the use of herself and her minor child for their financial loss in the death of the husband and father. In the second count the plaintiff sued for the use and benefit of the estate of W. L. Hill, on account of the mental and physical pain and suffering resulting from the injury. There was a verdict and judgment for the plaintiff on the first count in the sum of $12,000 and on the second count in the sum of $500, making a total of $12,500.

It is the contention of counsel that the verdict on the first count is excessive. No point in this respect is made on the second count, for it is conceded that W. L. Hill suffered great agony for the four or five days which he lived after receiving his injuries. At the time of his death, W. L. Hill resided in Memphis, and, besides his adult children, left his widow and a daughter seventeen years of age, who were dependent upon him for support. His wife testified that he was a very affectionate husband and father, and that he took great pride and interest in helping to raise their daughter. She said that her husband was sixty-one years old at the time of his death; that he weighed 160 pounds and was about five feet six inches tall; that he was very strong and also very industrious; that he was a piano salesman and solicitor; that he would get pianos by buying them and then sell them to other people; that he had a tuner with him who assisted him in his work, and that he made outside money enough in this way to pay his traveling expenses; that his earnings were from $150 to $175 per month; that he paid all of this to her alone, and that she disbursed it for the support of herself and family; that Mr. Hill's business called him away from home a good deal, and that she stayed at home with their daughter; that they had lived in Memphis about twenty-six years before his death, during which period he had followed the business of selling pianos either on salary or on commission; that sometimes he bought pianos and sold them again; that they were not in debt at the time of his death and that she usually paid cash for their living expenses. She denied that her husband got on frequent and protracted sprees. She testified that she had known him to go five years without drinking any at all. She testified that he was not addicted to excessive drinking; that he drank moderately; and that it never interfered with his business.

On the other hand, it was shown by the defendant that Hill was addicted to the excessive use of intoxicating liquors, and for this reason could not hold a position

long at a time, and that he did not make more than $50 per month above his traveling expenses. These facts were proved by the men for whom Hill had worked for several years prior to his death. It was shown that Hill's wife was having trouble with one of these firms with regard to a settlement of the amount alleged to be due her husband, but the witnesses said that this did not influence their testimony. They all claimed they were testifying to matters shown by their books. The life expectancy of Hill was thirteen and one-half years.

It is claimed by counsel for the defendant that the verdict is excessive, and that the evidence of Mrs. Hill has been completely overcome by the evidence adduced by the defendant. We can not agree with counsel in this respect. It is true that the defendant offered evidence as to what Hill was making, and the witnesses were men for whom Hill had worked and that they testified that they had taken the items from their books which showed the state of his account. This evidence, however, was not conclusive, because it was not admitted to be true, and Mrs. Hill testified that her husband gave her from $150 to $175 per month to be used in the support of herself and family. Her testimony in this respect was as to a matter which might or might not be true. It was as to a matter of which she had personal knowledge, and therefore her testimony was positive evidence. The testimony of the witnesses for the defendant of course was in direct conflict with her testimony, but the jury were the judges of the credibility of the witnesses, and it can not be said that the evidence adduced for the defendant conclusively disproved the testimony of Mrs. Hill. This is true because she testified as to matters of which she had personal knowledge and her testimony was therefore evidence of a substantive character. It was not opposed to any law of nature or to any well known scientific fact. It was relevant to the point at issue, and, if true, warranted the jury in returning a verdict for $12,-000. Being evidence of a substantive character and of matters of which Mrs. Hill had personal knowledge, it

could not be overcome by the testimony of the defendant as a matter of law, no matter how strong it might be. It is our duty to uphold a verdict when there is any evidence of a substantial character to support it. Therefore, it would be useless for us to enter into a discussion of the truth or falsity of her testimony. It is sufficient to say that it was believed by the jury, and warranted the verdict.

It follows that the judgment must be affirmed.