EVANS *v.* BLYTHEVILLE, LEACHVILLE & ARKANSAS SOUTHERN RAILROAD COMPANY.

Opinion delivered January 10, 1921.

1.  APPEAL AND ERROR—REVIEW OF DIRECTED VERDICT.—Upon review of an order directing a verdict for defendant, the Supreme Court views the testimony and the inferences deducible therefrom in the light most favorable to the plaintiff.

2. MASTER AND SERVANT—QUESTION FOR JURY.—In an action against a railroad company for the negligent death of a servant in a switch yard at night *held* that there was no testimony from which the jury could have found that deceased had a lantern which would have revealed his presence on the track, although deceased had stated to a witness shortly before he was killed that he was going to fill his lantern and go to the place where he was killed.

3. MASTER AND SERVANT—QUESTION FOR JURY.—In such action it was *held* a question for the jury whether the failure to give a back-up signal was negligence, although the railroad company had no rule requiring such a signal.

4. NEGLIGENCE—DEGREE OF CARE.—The degree of care must always be measured by the exigencies of the particular case.

5. MASTER AND SERVANT—NONEXISTENCE OF RULE AS NEGLIGENCE.— In an action against a railroad to recover damages for the death of an employee at night in a switchyard, it was competent to prove the nonexistence of a rule or custom to give a back-up signal, as tending to show that the failure to give such signal was not negligence; but the absence of such rule or custom is not conclusive on such subject.

6. MASTER AND SERVANT—RAILROAD'S DUTY TO PROVIDE RULES.—Negligence can be predicated on a failure to provide rules for the protection of a servant if a thing is not done which some rule should require to be done; but the absence of a rule or custom requiring a back-up signal in a switchyard will not prevent the failure to give such signal from being negligence.

7. MASTER AND SERVANT—QUESTION FOR JURY.—Evidence *held* to present a question for the jury whether a rule or custom required a back-up signal in a switchyard at night.

8. NEGLIGENCE—COMPARATIVE NEGLIGENCE.—In an action against a railroad company for the death of an employee in a switchyard at night, where deceased carried no lantern and the trainmen gave no back-up signal, whether or not the negligence of deceased was greater than that of the railroad company was for the jury.

Appeal from Mississippi Circuit Court, Chickasawba District; *R. H. Dudley,* Judge; reversed.

*Barham & Adams, A. F. Barham* and *J. T. Coston,* for appellants.

The court erred in directing a verdict for defendant. Evans was on duty, where he had a right to be, and he was killed by defendant's train; that makes a case of negligence in defendant which was not overcome by

any evidence showing the exercise of due care to prevent the injury. The company was negligent and is liable. Evans was not guilty of contributory negligence, and it was error to direct a verdict. A proper lookout was not kept. 102 S. W. 701-2. The killing by a train raises a presumption of negligence against the company. 99 S. W. 81. A case for a jury was made by the evidence. 3 Labatt on Master and Servant, § 1127; 15 S. W. 110; 2 Thompson on Neg, § 1574. Negligence of the company was shown. 84 Fed. 96; 54 Ark. 300; 58 *Id.* 214; 148 S. W. 648; 78 *Id.* 481; 15 *Id.* 110; 49 S. E. 87; 98 N. W. 244. See, also, 18 S. W. 683; 43 N. W. 332; 44 S. E. 664; 31 *Id.* 7.

*W. R. Satterfield* and *Buck & Lasley,* for appellee.

No negligence is shown on part of the defendant, and the negligence of the deceased was greater than that of defendant, and the court was correct in instructing a verdict on the contributory negligence of the deceased. A proper lookout was maintained, and there was nothing to submit to a jury. The burden was on appellant to show that if a closer lookout had been maintained the peril of deceased could have been discovered in time to have avoided the injury. 107 Ark. 431; 110 *Id.* 519; 117 *Id.* 483; 129 *Id.* 77. See, also, 113 Ark. 353. There is no evidence that appellee was negligent. Deceased was guilty of gross negligence, barring recovery, and a directed verdict was proper.

SMITH, J. Appellant is the widow and administratrix of John Evans, who was killed November 4, 1917, while employed by appellee railroad company, and she sues to recover damages for his death. There was a trial before a jury, which terminated in a verdict for the railroad company under the direction of the court.

It is insisted for appellee that the killing was caused solely and entirely by the negligence of Evans; that a proper lookout was being kept, and that sufficient warning was given that the train which killed him was about to move, by ringing the bell; and that no negligence was

shown on the part of the railroad company, and that, therefore, the negligence of Evans was greater than that of the railroad company, and that the court below was therefore correct in instructing a verdict on account of the contributory negligence of Evans.

Learned counsel for appellant invoke act 175 of the Acts of 1913, page 734, and say that under this act the contributory negligence of Evans can be considered only for the purpose of diminishing the recovery. But the last section of this act provides that it shall not apply to railroad corporations, and shall not amend or repeal any part of act 288 of the Acts of 1911 (page 56 of the General Acts of 1911). This last-named act provides that, when an employee is guilty of contributory negligence, such negligence shall not bar a recovery, provided the negligence of such employee was of a lesser degree than the negligence of such carrier, its officers, agents or employees.

The question for us to determine, therefore, is whether the testimony made an issue of fact for the jury as to whether the negligence of Evans was of a lesser degree than the negligence of the carrier, its officers, agents or employees; and, as the verdict was directed against the plaintiff, we must view the testimony and the inferences reasonably deducible therefrom in the light most favorable to the plaintiff. As thus viewed, the testimony may be summarized as follows:

The deceased's duties consisted in watering, coaling, cleaning and preparing the engines in the switch yard at Leachville, Arkansas, and the discharge of those duties required him to go about the yards at all hours of the night. The tracks at that place run north and south, and consist of the main track and three sidetracks, known as the main track, the brown track, the tank track, and the coal track. The brown track is west and the other two are east of the main track. The train approached from the south, going north. It went to the depot and then backed down on the brown track. Leachville was the terminal for this train, and it broke up there. The train

was put in on the brown track, and they cut the engine and one car loose and moved them on the main track, passing the switch. Then the engine and car backed in on the tank track and coupled to a string of cars standing there. The impact caused the string of cars standing on the tank track to move several feet, and the body of Evans was found under the wheels of one of those cars shortly afterward. The engine moving the cars which struck Evans was No. 8, and at the time of its arrival Evans and one Persinger were engaged in coaling Engine No. 10, which was standing on the coal track a few feet east of the tank track where the accident occurred. Shortly before the engine backed in on the tank track, Evans told Persinger he was going to put oil in his lantern and go over and see if No. 8 had coal enough to run the next day, and in going over to see about engine No. 8 it was necessary for Evans to cross the tank track about where his body was found. When the engine backed in on the tank track, the bell was ringing, but the back-up signal was not given. That signal consists in three short blasts of the whistle, and its meaning was well known to all railroad men.

The engineer testified that when he started with his train back on the tank track he was leaning out of the cab window on his left arm, looking south in the direction he was moving. That he had a clear view of the track and the place where Evans' body was found, and that he did not see any one there, nor did he see any light in that direction, and that there were no roads or streets crossing the tracks in the railroad yards. The fireman testified that he, too, was keeping a lookout, and that he saw no light where Evans was found; and so also did Garner, the brakeman, who threw the switch for the train to move on to the tank track. The engineer also testified that he left his engine for the night about 7:45 p. m., and that he first heard Evans had been killed about 10 p. m., and that, upon leaving his engine at night, if it had enough coal to run it the next day, it would be left on the brown track, and, if it did not have enough to run it the next day, it

would be placed on the coal track. As has been stated, Evans was killed on the tank track, and it is argued that from his knowledge of the customs of the yard he would reasonably have supposed that the engine would have been left on the brown track, or the coal track, as he had no information that the train was too long to remain on the brown track, and that he would not have reasonably anticipated that the train would back in on that track in the absence of the customary and well known signal that the train was about to back up. The engineer also testified that no rule required the giving of this back-up signal while switching in the yards, and that it was not customary to give it.

We think there was no testimony from which the jury could have found that Evans had a lantern which would have revealed his presence on the tracks. It is true Persinger testified that Evans said he would fill his lantern and see if engine No. 8 needed coal. But no one testified that Evans had put oil in his lantern, or that he had his lantern with him when he was killed. Had Evans' lantern been found smashed or overturned, we might say that the jury could have inferred that he had a lighted lantern when he crossed the yards, although it was not burning when his body was found. But no witness testified that he had a lantern, nor that any lantern was found near him, and there was, therefore, no testimony upon which a finding could have been made that Evans had a lantern when he was killed, and, in the absence of testimony which would support that finding, there could be no issue of fact in regard to the failure to keep a lookout, as Evans was evidently passing between cars when killed, and, if he had no lantern, an ordinary outlook would not have disclosed his presence between the cars. We do think, however, that the failure to blow the back-up signal makes a case for the jury; and this is true, although the railroad company may have had no rule requiring the engineer to give the back-up signal before backing up in the yards.

The degree of care required must always be measured by the exigencies of the particular case. *Railway Co.* v. *Triplett,* 54 Ark. 300. It was competent to prove the nonexistence of a rule or custom to give the back-up signal as tending to show that the failure to give this signal was not negligence; but the absence of a rule or custom is not conclusive of the subject. *Yazoo & M. V. Ry. Co.* v. *Hill,* 141 Ark. 378. Ordinary care might demand that the signal be given, and, if so, the absence of such rule or custom would not prevent the failure to give it from being negligence. Negligence can be predicated upon a failure to provide rules for the protection of persons whose safety may be endangered if a thing is not done which some rule should require to be done. 3 Labatt, Master and Servant, § 1127; 2 Thompson on Negligence, § 1574; 1 White, Personal Injuries on Railroads, § 263; *Fordyce* v. *Briney,* 58 Ark. 214; *Railway Co.* v. *Triplett, supra; Bain* v. *Northern Pac. Ry. Co.,* 98 N. W. 244; *International & G. N. R. Co.* v. *Hinzie,* 18 S. W. 683; *Smith* v. *Atlanta, etc., R. Co.,* 44 S. E. 664; *Fort Smith Lbr. Co.* v. *Shackleford,* 115 Ark. 572; *Railway Co.* v. *Hammond,* 58 Ark. 324.

Moreover, we think the testimony of the engineer that he was not required by rule or custom to give the back-up signal was not undisputed. The brakeman, Garner, who threw the switch for the train to back on to the tank track, testified as follows:

"Q. Mr. Garner, how far were you from the side of the train at the time they started down in response to your signal? A. How far was I from the track when I throwed the switch, and they started to back in there? Q. Yes, sir. A. I was standing right by the side of the track. Q. You could not see what was beyond those cars, could you? A. If it had been right against the cars, I could not. Q. And you could not see what was between them, could you? A. If there had been a light there, I could have seen it. Q. If there had been a light there, you could have seen it shining? A. Yes, sir. Q. Mr. Garner, in backing up, if the view of the train crew

is obstructed, what would you do to let the people who might be on the track know you were coming? A. Sound the whistle."

This witness was asked, "Is it the rule when you back up in a yard like that to give the back-up signal?" and answered, "It is hardly ever done," but he did not say there was no rule on the subject. The witness further testified as follows: "Q. In all your experience did you ever know a back-up signal given when you set that train in there like you did that night? A. I don't remember it. Q. You never heard of it being done at that place, did you? A. No, sir; I don't remember it." We think this testimony in its entirety made an issue of fact as to whether there was a rule in regard to giving back-up signals.

Here there were four tracks; and while the ringing bell should have apprised Evans that the engine was in motion, or was about to be put in motion, it did not notify him the direction in which it was moving. Three blasts of the whistle would have given him that information unmistakably. The engineer testified that railroad employees understood that signal just like they did the English language, and we can not say, from the testimony, that Evans did not have the right to expect that this signal would be given.

If the exercise of ordinary care required that this signal be given, then the failure to give it was negligence; and, if Evans had the right to expect that signal to be given, that fact should be taken into account in measuring his negligence. We think the record presents these questions of fact, and that the jury should therefore have been allowed to say whether or not the negligence of Evans was greater than that of the railroad company, and for the error in directing the verdict the judgment will be reversed and the cause remanded for a new trial.

McCulloch, C. J. (dissenting). The complaint contains no charge of negligence in failing to provide adequate rules for the safety of employees of the company

working in the yards. ` The only charge of negligence in the complaint is that the trainmen failed to keep a lookout and in failing to give a signal. But, even if there had been such a charge of negligence with respect to the failure to provide a rule, it would have been the duty of the court to determine the reasonableness of that rule and not submit it to the jury, and the omission to provide for the back-up signal did not make the rule unreasonable if there was a rule requiring that the bell be rung. There would have been nothing to submit to the jury in regard to negligence in failing to provide an adequate rule for the safety of employees, even if the complaint had contained such a charge of negligence.

It seems to me that, according to the undisputed evidence, there was no rule requiring a back-up signal to be given in the yards for the protection of employees. The engineer testified that there was no such rule or custom, and Garner's testimony is not in conflict with that. He did not state, in so many words, that there was no such rule or custom, but he stated that the back-up signal was rarely ever given in the yards. In fact, he stated that he had no recollection of a single instance where it had been done. Now, since there was no rule or custom providing for the back-up signal, I fail to see how a charge of negligence can be based on failing to give such a signal, it being shown by undisputed testimony that the bell was ringing at the time the train moved backward. If there was no rule or custom to that effect, then appellant's intestate had no right to assume that the train would not be moved without giving the back-up signal.

Mr. Justice WOOD concurs.